UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JEFFREY FRANKEL, | ) | |
| PLAINTIFF, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 3:16-CV-00227 (VLB) |
| | ) | |
| THE TJX COMPANIES, INC., d/b/a | ) | July 10, 2017 |
| T.J. MAXX, | ) | |
| DEFENDANT. | ) | |

## Memorandum of Decision Granting Summary Judgment

Plaintiff Jeffrey Frankel ("Plaintiff" or "Frankel") brings this action for damages and equitable relief against Defendant The TJX Companies, Inc. ("Defendant" or "T.J. Maxx") alleging employment discrimination and unlawful retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(d) and the Connecticut Fair Employment Practices Act ("CFEPA"), Connecticut General Statute § 46a-60.  [Dkt. 14.]  Currently before the Court is Defendant's Motion for Summary Judgment as to all claims.  [Dkt. 27.]  For the reasons set forth below, Defendant's Motion is GRANTED as to all claims.

I.    Background

Plaintiff has been working in the retail industry since 1968.  [Dkt. 28-1 (Frankel Dep.) at 10.]  He worked as an assistant store manager, department manager, operations manager, and store manager at Bradley's Discount store from 1968 to 1993.  *Id.*  Plaintiff voluntarily resigned from Bradley's to accept an offer of employment at Caldor's Department Store.  *Id.*  Plaintiff worked as an assistant manager at Caldor's until 1999, when the store closed.  *Id.*

1

T.J. Maxx hired Plaintiff in April 1999, when Plaintiff was 49 years old. Frankel Dep. at 40; 168.  Plaintiff remained continuously employed by T.J. Maxx until his termination in January 2014.  *Id.* at 40; 168.  Plaintiff was an assistant manager throughout his tenure with T.J. Maxx.  *Id.* at 41.

    a.  <u>Plaintiff's Performance</u>

Plaintiff received annual performance reviews which included numerical scores in a number of categories including, for example, "customer service," "acts with integrity," and "leads with vision."  [Dkt. 28-12 (Performance Evaluations).][1]  Based on the total score, employees are given an overall rating of "outstanding," "exceeds expectations," "meets expectations," "clear development needs," or "unsatisfactory."  *Id.*  Plaintiff's annual evaluations were completed by his store manager, which changed periodically throughout his employment.

In addition to tracking employees' performance through annual evaluations, Defendant has a Corrective Action Policy which provides that employees who do not meet job expectations may be disciplined through "sequential steps" including counseling, two "corrective action written warnings," and termination.  [Dkt. 28-7 (Corrective Action Policy) at 1.]  However, in "more critical, serious situations, . . . a written warning or immediate termination must be the first step in the correction process."  *Id.*  When determining whether to terminate an assistant store manager, the district manager gathers statements from relevant individuals and reviews any available

_____

[1] Not all of Plaintiff's performance reviews were provided to the Court.

data, and then asks someone in the associate relations or legal department to review the information as well. [[Dkt. 28-9 (Deposition of Human Resources Manager Lelia Ricard) ("Ricard Dep.") at 29.] The district manager makes final firing decisions. *Id*. at 30.

In 2001, supervisor Angela Yearwood gave Plaintiff an overall rating of "meets expectations." Performance Evaluations at 2. The review indicates Plaintiff needed to better "articulate goals needing to be achieved," not "allow obstacles to delay daily work efforts," "reach established goals on a consistent basis," and "consistent[ly] follow up to ensure maximum productivity." *Id*. at 5. In 2003, supervisor Robert Indra also assigned Plaintiff an overall rating of "meets expectations." *Id*. at 8. The review indicates Plaintiff "tends to make decisions that are based solely on his own areas and not the whole store. He needs to grasp the 'team' concept and maintain a total store awareness." *Id*. at 17. In 2004, supervisor Natasha Jacobs gave Plaintiff an overall rating of "exceeds expectations." *Id*. at 19. The review states Plaintiff "can be trusted with company information," and "contribute[s] greatly to the store's success." *Id*. at 20. However, notes also indicate Plaintiff "occasionally places his own interest ahead of company goals" and "needs to gain the trust of his peers." *Id*. In 2005, supervisor Laurie Zuchinsky also gave Plaintiff a "meets expectations" rating and indicated he should work to "hold [associates] accountable daily and provide feedback consistently." *Id*. at 24-25. No review was provided for 2006.

From 2007 to 2012, store manager Andrew Weickowski completed Plaintiff's evaluations. Plaintiff's 2007 evaluation stated he "met expectations,"

was "active in developing others" and "share[d] his retail experience to teach coordinators and associates." *Id*. at 28.  In 2008, Mr. Weickowski gave Plaintiff the same overall score and stated Plaintiff "must continue to shift more responsibility to his direct report" and "needs to be more involved in the entire store operation not only limited to his own area." *Id*. at 30.  In 2009, Mr. Weickowski raised Plaintiff's overall rating to "exceeds expectations" and stated he "provides tasks for coordinators but must make them more challenging" and "must spend more time with those who need help for further development."  *Id*. at 33.  In 2010, Mr. Weickowski decreased Plaintiff's overall rating to "meets expectations," however feedback indicated Plaintiff "achieved" his "individual development plan" by training all subordinates to company policies.  *Id*. at 38.

In 2011, Mr. Weickowski gave Plaintiff the lowest score within the "meets expectations" range and stated Plaintiff "should be able to react properly to any issues happening at the store.  Jeff received 2 formal counsels for not taking proper actions with associates-related issues and using LP equipment."  *Id*. at 40-41.  Each "formal counselling" Plaintiff received was memorialized by Mr. Weickowski.  [Dkt. 28-13 at 2-3.]  The first formal counselling memorandum referenced in Plaintiff's 2011 review, from September of that year, states Plaintiff needed to adhere to store protocol and relay "any incident of any nature" to the store manager "right away."  *Id*. at 3.  The second formal counselling memorandum, from October 2011, states Plaintiff entered the store's office, turned on the security cameras and watched activity on the sales floor without authorization.  *Id*.  The memorandum indicates Plaintiff violated store policies

which required him to "be present at the front of the store and walking the sales floor to ensure customer service" and which prohibit store managers from "operat[ing] and/or view[ing] . . . cameras without prior authorization." *Id.*

In February 2012, Glen Schwarz replaced Mr. Weickowski as Plaintiff's store manager. [Dkt. 28-11 (Schwarz Dep.) at 35.] Mr. Schwarz was 42 years old in 2012 and Plaintiff, at age 62, was the store's oldest employee. [Dkt. 32-3 at 17; Dkt. 32-2 at 24.] In Plaintiff's 2012 annual review, Mr. Schwarz assigned Plaintiff an overall score two points higher than Mr. Weickowski awarded him in 2011, but still on the low end of the "meets expectations" range. [Dkt. 28-12 at 44.] Mr. Schwarz's notes indicate Plaintiff "needs to spend more time working with his coordinator and his associates assigned to him" and "needs to consistently train and follow up and hold accountable his associates." *Id.* at 44.

Consistent with the 2012 review, Mr. Schwarz memorialized a formal counseling memorandum in May 2012 which stated Plaintiff "has been spoken to several times in the past month on Merchandise Presentation and signing of features. . . . This is Jeff's area of responsibility and is not being addressed with his associates." [Dkt. 28-14 at 2.] Three months later, in August 2012, Mr. Schwarz memorialized another formal counseling. *Id.* at 4. This memorandum stated Plaintiff failed to provide necessary support to the Loss Prevention department, which "put the safety of the Loss Prevention associate at risk and sen[t] a message to the Loss Prevention team that he doesn't care." *Id.*

In February 2013, as part of Defendant's annual succession planning,[2] Mr. Schwarz compiled a talent summary grid based on "observations [he] made throughout the year in 2012."  [Dkt. 32-3 at 7.]  He categorized Plaintiff as "C potential, which [means he] cannot advance beyond current level."  [Dkt. 32-6 at 7.]

In June 2013, District Manager Ruthanne Sapienza gave Plaintiff a written warning for failing to appropriately address a customer concern.  [Dkt. 28-17.]  The warning stated a customer "had a problem with an associate at the Jewelry counter.  Instead of going over and helping out, Jeff sent another associate to take care of the customer.  This caused the customer and the first associate to continue to exchange words and the associate caused the customer to feel threatened."  *Id.*

In September 2013, Mr. Schwarz gave Plaintiff a mid-year review and again rated Plaintiff on the low end of the "meets expectations" range.  [Dkt. 28-12 at 50.]  Mr. Schwarz emphasized that the incident memorialized in Plaintiff's June 2013 written warning "resulted in the termination of an associate and put another associate in an uncomfortable situation."  *Id.* at 50.  Mr. Schwarz indicated Plaintiff "needs to work with the associates and management in building a positive relationship."  *Id.* at 50.  At a mid-year review meeting with Plaintiff, Mr.

---

[2] **Defendant's management regularly discusses hiring replacements for employees who may retire "as a succession planning conversation."  [Dkt. 28-4 (Sapienza Dep.) at 22;  *see also* Dkt. 32-6 (Ricard Dep.) at 5 (stating succession planning was "typically" discussed around February of each year).]  Succession planning includes building a "talent summary," which is a "nine-box talent grid" including every member of management within a district, which is updated "a couple of times a year."  *Id.*

Schwarz informed Plaintiff he would not receive a bonus for that year or a salary increase. [Dkt. 32-2 at 23.] After Plaintiff's mid-year review, Ms. Sapienza directed Mr. Schwarz to begin keeping a log of Plaintiff's performance. [Dkt. 32-3 at 7.]

In November 2013, Ms. Sapienza consulted with Lelia Ricard, the Manager of Human Resources, and decided to issue Plaintiff a second written warning regarding his general performance. [Dkt. 28-18; Dkt. 28-19.] The written warning did not detail a specific incident but stated "Jeff has not provided appropriate direction or support of the team. Jeff needs to set clear expectations for performance and deliver feedback. Jeff also does not plan, prioritize and delegate tasks effectively. . . . Jeff has become reactive instead of being proactive to daily responsibilities resulting in the building not running smoothly." [Dkt. 28-18.]

In connection with the second written warning, Ms. Ricard suggested that Plaintiff be required to create an "action plan" and meet with another employee weekly to track Plaintiff's performance. [Dkt. 28-19.] Plaintiff's action plan, dated November 20, 2013, states Plaintiff would improve his performance by scheduling regular meetings and setting clear requirements for cashiers under his watch. [Dkt. 28-20.]

On December 27, 2013, Ms. Sapienza issued Plaintiff another written warning, for leaving money in the cash register in the Jewelry department overnight. [Dkt. 28-21.] Plaintiff disputed whether he left money in the register, but Ms. Sapienza confirmed with another store associate that the money was left

7

in the register on an evening when Plaintiff was the assistant manager on duty. [Dkt. 28-23 (email exchange between Ms. Sapienza and Ms. Ricard).]  The written warning includes a note stating Plaintiff "closed the register and left the money inside.  He thought someone else would pick up."  [Dkt. 28-21.]

**b.  The January 3, 2014 Incident and Plaintiff's Termination**

Defendant's building security policy states "a member of management may enter the building only when accompanied by another associate.  Doors must be immediately re-locked before proceeding to the office to deactivate the alarm." [Dkt. 28-24 at 2.]  Violations of the building security policy "are cause for corrective action up to and including termination of employment."  *Id.* at 3. Plaintiff learned of the requirements of the building security policy "[m]aybe a couple weeks after [he] started."  [28-1 at 61-62.]

At 8:00 am on January 3, 2014, Plaintiff was the first member of management to arrive at Defendant's store.  Frankel Dep. at 126-27.  A cleaning crew was waiting at the front door and a store associate, Michael Martinez, was waiting in the parking lot.  *Id.*  Plaintiff unlocked the first door and the cleaning crew followed him into the entryway.  *Id.*  Plaintiff then unlocked the second door, relocked the second door for security, and ran to the office to turn off the store's security alarm and answer a phone call from a customer.  *Id.*  Plaintiff asserts he thought the cleaning crew followed him into the store instead of waiting in the entryway.  *Id.*

Sometime that morning, before 8:30 am, District Loss Prevention Manager Elizabeth Ocasio called the store and asked Plaintiff with whom he had opened

the store.  [Dkt. 28-28.]  Jeff told Ms. Ocasio he opened the store with the cleaners.  *Id.*  When Mr. Schwarz arrived at the store at 8:30am, he asked Plaintiff, "who's here with you."  [Dkt. 32-3 at 15.]  He recalls Plaintiff responded that he "came in with Michael and the cleaners."  *Id.*; Dkt. 28-27 (January 9 memorandum by Mr. Schwarz summarizing January 3 conversation) ("Jeff said he came into the building with Mike who was the only associate besides the cleaners.").

The following day, Mr. Martinez complained to Mr. Schwarz that he had to wait outside in the cold with the cleaners until Plaintiff came outside the store and unlocked the door for them.  [Dkt. 28-27.]  Mr. Schwarz then informed Ms. Ocasio about Plaintiff and Mr. Martinez's conflicting accounts.  *Id.*  Ms. Ocasio reviewed video surveillance footage from January 3 and memorialized her impression: "Jeff is observed entering the store by himself at approximately 7:57 am.  At approximately 7:59 am Michael is observed at the vestibule with the 2 floor cleaners.  At approximately 8:02 am Jeff is observed walking to the front to let Michael and the 2 floor cleaners in."  [Dkt. 28-26.]  The parties have not provided the Court with a copy of the video recording.

On January 9, Ms. Ocasio interviewed Plaintiff with Mr. Schwarz present as a witness.  [Dkt. 28-28 (memorandum by Ms. Ocasio summarizing January 9 meeting).]  She again asked Plaintiff with whom he opened the store on January 3, and Plaintiff replied he had opened the store with the cleaners.  *Id.*  Ms. Ocasio replied that the video surveillance footage showed him entering the building alone, and Plaintiff reiterated that "as far as he can recall, he opened with the cleaners, and that Michael came a few minutes after."  *Id.*  Ms. Ocasio asked

Plaintiff if he knew Defendant's store opening procedures, and he said "a manager has to enter with someone else."  *Id.*

Ms. Ocasio and Associate Relations Manager Soledad McCabe also questioned Plaintiff's account because, while Plaintiff asserted he ran to the back office to answer the phone, there are "10 phones on his way to the assistant manager's office" (Ocasio Dep. at 29) which he could have answered (McCabe Dep. at 142).  The video surveillance recording does not include sound and cannot confirm or disprove whether a phone was ringing when Plaintiff entered the store.  McCabe Dep. at 142.

After Plaintiff's building security violation, Ms. Ocasio discussed the incident with Ms. Sapienza and Ms. Ricard.  [Dkt. 28-23.]  Ms. Ricard asked Ms. McCabe to partner with her in addressing the incident.  *Id.*  Ms. Ricard "shared . . . any notes or emails that [she] may have had pertaining to [Plaintiff's] file" (Ricard Dep. at 91-92) with Ms. McCabe, who reviewed "everything . . . leading up to the termination of [Plaintiff's] employment."  [Dkt. 28-8 (McCabe Dep.) at 80.]  Ms. Ricard and Ms. McCabe recommended that Ms. Sapienza terminate Plaintiff's employment, citing Plaintiff's "policy/procedure violation" and "a formal & 2 ww's [written warnings] on file."  [Dkt. 28-31 (email exchange between Ms. Ricard, Ms. McCabe, and Ms. Sapienza dated 1/15/2014).]  Ms. McCabe, Ms. Ricard, and Ms. Sapienza added in their depositions that Plaintiff was terminated because of his "previous corrective action, . . . currently violated policy, . . . [a]nd [because] during the fact-finding he was found to be untruthful . . . about the incident that happened . . . [by] saying that he had come into the store with someone else."

McCabe Dep. at 173-74; *see also* Ricard Dep. at 52 (stating they considered the fact that Plaintiff "lied about the facts of the day" when deciding to terminate him); Sapienza Dep. at 78 ("He was terminated for violating a policy and lying about it.").

Mr. Schwarz formally terminated Plaintiff on January 20, 2014.  [Dkt. 28-25.] At the termination meeting, Plaintiff told Mr. Schwartz the termination was not fair because Plaintiff was "rushing to come in.  I am trying to protect the assets of the company."  [Dkt. 32-2 at 29.]  Plaintiff asked for the regional manager's phone number so he could register his complaint, and Mr. Schwarz refused to provide it. *Id*.  Rather, Mr. Schwarz gave Plaintiff "cash . . . like $5,400 for my week's pay and a week of vacation that he owed me.  And he said 'You have to leave[.]'" *Id*. Plaintiff found and wrote down regional manager Jim Hannon's phone number and called Mr. Hannon from the parking lot. *Id*. at 29, 31.  Mr. Hannon advised that he was "going to check and get back" to Plaintiff regarding his complaint. *Id*. at 31.  The parties have not provided the Court with further information about that interaction.

Sometime after his employment, Plaintiff called Ms. McCabe to dispute his termination.  [Dkt. 32-5 at 19-20.]  As a result of that meeting, Ms. McCabe made a note that Plaintiff "may feel he's being discriminated against."  [Dkt. 32-5 at 19.] Ms. McCabe also made a note that Plaintiff "feels like [Mr. Schwarz] has been harassing him," by "picking on . . . everything he does." *Id*. at 23.  She also recorded that Plaintiff felt the incident in which he was given a written warning for leaving money in a cash register overnight was fabricated, and "he felt that he

was being set up.  He felt that they were, these dollar bills, planted in the register."  *Id*.  Plaintiff also told Ms. McCabe he thought Mr. Schwarz "hated him," but he could not articulate a "real reason as to why he felt he hated him other than he was feeling he was being set up."  *Id*.

After Plaintiff's termination, a 56 year-old assistant manager was transferred from another of Defendant's store locations to assume some of Plaintiff's duties.  Sapienza Dep. at 23, 25.  Since 2007, 76% of the assistant managers and store managers Defendant employs have been over the age of 40.  [Dkt. 28-34.]  In the two years before Plaintiff's termination, Defendant fired 15 employees, 10 of which were over the age of 40 and 2 of which were over the age of 50.  [Dkt. 28-35.]

c.  Plaintiff's Age Discrimination Complaints

Throughout 2012 and 2013, Plaintiff felt Mr. Schwarz treated him differently from younger employees.  For example, Mr. Schwarz asked Plaintiff to re-do displays in his merchandise area but did not ask employees in charge of other areas to re-do displays with the same flaws, neglected to invite Plaintiff to his office for a "genial conversation" as he did with younger employees, and failed to give Plaintiff a "head's up" when the regional vice president was in the area even though he told "all the other managers," which resulted in Plaintiff being "at a different level of preparedness."  [Dkt. 32-2 at 23-24.]  Ms. Sapienza testified at her deposition that Mr. Schwarz "worked very hard to meet each person where they needed him to meet them" and "treated them each based on what they needed from him."  [Dkt. 32-4 at 7.]

In addition, Plaintiff asserts Mr. Schwarz discriminatorily transferred Plaintiff to manage different merchandise departments multiple times, placing younger employees in charge of departments Plaintiff previously managed.  [Dkt. 32-3 at 11.]  While Plaintiff was transferred to departments which constitute a smaller percentage of the store's sales, no department transfer was a formal "demotion" or resulted in a change in Plaintiff's compensation.  [Dkt. 28-10 at 15.]

Plaintiff also recalls a number of remarks Mr. Schwarz made regarding Plaintiff's age.[3]  In December 2013 or January 2014, Mr. Schwarz remarked to Plaintiff that his routine of going "through the store and get[ting] three separate checks to make sure everything was price ticketed" was "old school."  [Dkt. 32-1 at 5.]  At another unspecified date, Mr. Schwarz discussed with Plaintiff his "hands-on" management style and tendency to "hop in and do the work."  [Dkt. 32-1 at 8.]  Mr. Schwarz stated "You're a dinosaur.  Nobody else does it like that." *Id.*  Plaintiff remembers Mr. Schwarz calling Plaintiff a "dinosaur" "between three and four times during the course of the year."  *Id.*  In addition, in January 2014, a cashier asked Plaintiff when he was going to be retiring, and asserted Mr. Schwarz had directed him to ask Plaintiff the question.  [Dkt. 32-1 at 5.]

Aside from interactions with Mr. Schwarz, Plaintiff felt he was being forced out of Defendant's company when Regional Vice President Jim Hannon visited Plaintiff's store in January or February of 2013.  [Dkt. 32-1 at 6.]  At that meeting,

---

[3] At Plaintiff's deposition, he described a conversation between Mr. Schwarz and another employee regarding Plaintiff's ability to learn a new computer program, which the other employee later relayed to Plaintiff.  [Dkt. 32-1 at 6.]  Plaintiff's testimony regarding that conversation is inadmissible hearsay not to be considered at summary judgment. Fed. R. Civ. P. 56(c)(4).

13

Mr. Hannon stated "he had 14 management people that were close to retirement age that he needed to replace." *Id.* Plaintiff never asked Mr. Hannon whether he was referencing Plaintiff and never complained to anyone within Defendant's company about the announcement. [Dkt. 32-1 at 7.] Ms. Sapienza does not recall whether she and Mr. Schwarz specifically discussed who might replace Plaintiff upon his retirement, but asserted Defendant's managers regularly discuss general succession planning, including "if so and so were to leave in the next year, who are we going to get ready to step into that role or do we have to look externally." [Dkt. 28-4 (Sapienza Dep.) at 22.]

Plaintiff also asserts the building security policy was enforced in a discriminatory manner resulting in his termination. Plaintiff doesn't "ever recall [the building security policy] being enforced in the entire time I worked for T.J. Maxx." [Dkt. 28-1 at 61-62.] However, while Plaintiff remembers entering the building to find members of management "sitting in the office with no one else there," he could not recall at his deposition an instance where he witnessed a person enter the store by him or herself without another employee. *Id.*

Plaintiff "did not make any complaints" of differential treatment during his employment. Frankel Dep. at 23 ("I did not make any complaints during the time I was there."). Plaintiff later clarified that while he did not use the terms "age discrimination," he complained to Mr. Hannon and Ms. McCabe that he was "the most senior person," and had been "replaced in each one of my jobs by a younger manager," which he asserts should have put them on notice that he was complaining of age discrimination. [Dkt. 32-2 at 32.] Plaintiff also asserts he

"complained to the district manager [Ms. Sapienza] frequently that [he] wasn't being treated fairly" by Mr. Schwarz, but did not assert age discrimination "specifically" until after his termination.  *Id.* at 119.

In addition, Plaintiff states he complained to operations manager Dave Herasco about a conversation between Plaintiff and Mr. Schwarz.  [Dkt. 32-2 at 8.] In that conversation, Plaintiff told Mr. Schwarz he thought someone else was supposed to refill the computer paper, and Mr. Schwarz replied: "Well, that is old school.  If we don't have it, you have to just go and get it."  [Dkt. 32-2 at 8.]  When Plaintiff relayed the conversation to Mr. Herasco, Mr. Herasco responded, "I will reorder it and get some."  *Id.*

Although he made no complaints regarding age discrimination during his employment, Plaintiff was aware that he could have called Defendant's human resources manager with any complaints and knew to report to Defendant's district office any harassment or discrimination complaints relayed to him by other employees.   Frankel Dep. at 23-24.

## II.   Statement of Law

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion."  Fed. R. Civ. P. 56(a).  In order to prevail, the moving party must sustain the burden of proving that no factual issues exist.

*Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought.  *Id.*  (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted).  In addition, "the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury."  *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'  At the summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir. 1996)).  "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim."  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson*, 477 U.S. at 251).

A court must make the threshold determination of whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250. Judges are not required "to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a *scintilla* of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson*, 477 U.S. at 251 (citing *Pennsylvania R. Co. v. Chamberlain,* 288 U.S. 333, 343 (1933); *Coughran v. Bigelow,* 164 U.S. 301, 307 (1896)). Indeed, summary judgment should be granted where the evidence is such that it "would require a directed verdict for the moving party." *Sartor v. Arkansas Gas Corp.*, 321 U.S. 620, 624 (1944).

"A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials."

Fed. R. Civ. P. 56(c)(1).  A party may also support their assertion by "showing that the materials cited do not establish the absence . . . of a genuine dispute."  *Id.* Cited documents must consist of either "(1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."  Local R. Civ. P. 56(a)3; *see also* Fed. R. Civ. P. 56(c)(4).

The Court need not consider any materials that the parties have failed to cite, but may in its discretion consider other materials in the record.  Fed. R. Civ. P. 56(c)(3).  If a party fails to properly support an assertion of fact, or fails to properly address another party's assertion of fact, the Court may grant summary judgment on the basis of the undisputed facts.  D. Conn. L. Rule 56(a)(3) (stating that "failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with [Local] Rule 56(a)(1) or in the Court imposing sanctions, including . . . an order granting the motion if the undisputed facts show that the movant is entitled to judgment as a matter of law").

III.   **Analysis**

Defendant moves for summary judgment as to Plaintiffs claims for discrimination and unlawful retaliation under ADEA and Connecticut law.  The Court addresses each argument in turn below.

a.   **Discrimination under ADEA**

To state a claim for age-based employment discrimination, a complainant must establish a prima facie case of by showing:

(i)      that he belongs to a protected class;

> (ii)   that he was qualified for the position;
> (iii)  that he suffered an adverse employment action; and
> (iv)  that the circumstances surrounding the employment action give rise to an inference of discrimination.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Under the ADEA, Plaintiff must ultimately show but-for causation.  *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 167 (2009); *see also, e.g.*, *Percoco v. Lowe's Home Centers, LLC*, 208 F. Supp. 3d 437, 448 (D. Conn. 2016) (applying but-for causation standard set forth in *Gross* to age discrimination claim).  A plaintiff only carries a *de minimis* burden to establish a prima facie case.  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001).  As to the fourth prong, a plaintiff may draw an inference of discriminatory intent from evidence that he was "treated differently from similarly situated" people, or evidence of "the employer's criticism of the plaintiff's performance in . . . degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."  *Id.* at 468.

     If the complainant makes out a prima facie case, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection.  *McDonnell Douglas Corp.*, 411 U.S. at 802-03.  Defendants need only proffer, not prove, the existence of a nondiscriminatory reason for their employment decision.  *See Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  "This burden is one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (internal quotations omitted).  If employer does so, the

burden shifts back to the complainant to show the employee's legitimate, nondiscriminatory reason is a pretext for prohibited discrimination. *Id.* at 804. To establish pretext, the complainant may raise "facts as to the [employer's] treatment of [complainant] during his prior term of employment; [the employer's] reaction, if any, to [complainant's] legitimate civil rights activities; and [the employer's] general policy and practice with respect to minority employment." *Id.* at 804-05.

If Defendant meets its burden of production, the burden shifts back to Plaintiff to show that the legitimate, nondiscriminatory reason offered by the Defendant is mere pretext for illegal employment discrimination. *McDonnell*, 411 U.S. at 804. Where a complainant shows a prima facie case and the employer raises a legitimate, non-discriminatory purpose for the hiring decision, but the complainant "cannot offer direct evidence of an improper discriminatory bias," the complainant must rely on the "strength of his prima facie case combined with circumstantial evidence that [the employer's] stated reason for failing to hire [the complainant] is pretext" in order to defeat summary judgment. *Byrne*, 243 F.3d at 102. The Court "must respect the employer's unfettered discretion to choose among qualified candidates," and "does not sit as a super-personnel department to reexamine a firm's business decisions about how to evaluate the relative merits of education and experience in filling job positions." *Id.* at 103; *Newsom-Lang v. Warren Int'l, Inc.*, 80 F. App'x 124, 126 (2d Cir. 2003). However, "an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment

decision." *Id.* Where the "credentials of the person selected for the job" are such that "no reasonable person . . . could have chosen the candidate selected over the plaintiff," the employer's hiring decision may not stand. *Barry v. New Britain Bd. of Educ.*, 300 F. App'x 113, 114 (2d Cir. 2008) (citing *Byrne*, 243 F.3d at 103).

Plaintiff meets the first prong of an age discrimination claim as he was over 40 years old throughout the relevant time period. Frankel Dep. at 40. In addition, because Plaintiff never received below a "meets expectations" review and has significant retail experience, Plaintiff has established that he was qualified for his assistant manager position. Frankel Dep. at 10; Performance Evaluations. As to the third prong of a prima facie case, Plaintiff's termination qualifies as an adverse employment action.[4] *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (2d Cir. 1993). Because Plaintiff carries only a *de minimis* burden to prove his prima facie case, the Court finds the fourth prong satisfied. *Abdu-Brisson*, 239 F.3d at 467. Plaintiff's assertions that store management referred to him as a "dinosaur," remarked that his work style was "old school," and criticized his merchandise department more than others with the same flaws create a *de*

---

[4] Only one adverse employment action is needed to establish a prima facie case of age discrimination, however the Court notes Plaintiff's argument that his transfer to manage different merchandise departments. [Dkt. 32 at 21.] "A materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady*, 993 F.2d at 136. Ms. Sapienza testified that "all assistant manager positions are the same" level of prestige, even though some departments constitute a greater or lesser percentage of the store's business. Sapienza Dep. at 14-15. There is no evidence that those transfers affected Plaintiff's compensation, benefits, or potential for advancement. Plaintiff has offered no evidence that his transfers between departments were more "than a mere . . . alteration of job responsibilities" and has not established that those employment actions are adverse.

*minimis* inference of discrimination and complete Plaintiff's prima facie case.
[Dkt. 32-1 at 5, 8; Dkt. 32-2 at 23-24.]

Defendant in turn has "articulate[d] some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp.*, 411 U.S. at 802-03. Plaintiff violated Defendant's building security policy by entering the store alone on January 3, 2014. Frankel Dep. at 126-27; Schwarz memorandum dated 1/9/2014); Dkt. 28-26 (Ms. Ocasio's summary of video camera surveillance showing Plaintiff entered the building alone); Dkt. 28-24 (building security policy). Defendant's building security policy states violations "are cause for corrective action up to and including termination of employment." *Id.* at 3.

Defendant also asserts it terminated Plaintiff because he lied about his building security policy violation. McCabe Dep. at 173-74; Ricard Dep. at 52; Sapienza Dep. at 78. Plaintiff disputes that his statement that a fellow employee was with him does not assert, and was not intended to assert, that the fellow employee entered the store simultaneously with Plaintiff, but rather that he was also present on the premises to open the store that day and that they were in the store together by 8:30 am when he was asked "who's here with you." [Dkt. 32-3 at 15; Frankel Dep. at 126-27.] The Court finds Plaintiff gave conflicting statements to various members of management who asked with whom he entered the building. The store video, the existence and veracity of which Plaintiff does not challenge, confirms his dishonesty. His credibility was further impugned by his claim that he entered the building alone and went to the office to answer the telephone by the fact that there were numerous telephones closer to the store

22

entrance than the office.  However, because the building security policy clearly allows for an employee's termination due to a policy violation alone, and does not also require untruthfulness, Defendant has set forth a legitimate, nondiscriminatory purpose for terminating Plaintiff regardless of whether he lied.

Defendant also asserts Plaintiff was terminated because he repeatedly violated company security protocols.  As a result of these violations, he required "previous corrective action" (McCabe Dep. at 173-74) including two prior written warnings.  [Dkt. 28-31 (email exchange between Ms. Ricard, Ms. McCabe, and Ms. Sapienza dated 1/15/2014).]  Defendant's Corrective Action Policy calls for termination when an employee has required counseling and two "corrective action written warnings."  [Dkt. 28-7 (Corrective Action Policy) at 1.]  Even if Plaintiff had not been previously disciplined, the Corrective Action Policy allows for "immediate termination" in "more critical, serious situations."  *Id.*  Plaintiff's prior disciplinary record, together with the policy violation and dishonesty which precipitated Plaintiff's termination, establishe a legitimate, nondiscriminatory reason for his termination.

The burden then shifts back to the Plaintiff to establish that Defendant's legitimate, nondiscriminatory reason for firing him was a "mere pretext" for discrimination.  Plaintiff points to perceived inconsistencies in the record to raise an inference that Defendant is concealing the real reason it fired Plaintiff. However, Plaintiff points to no truly inconsistent statements by Defendant's management in the record and, even if there were inconsistencies, offers no evidence that Defendant's statements are a mere pretext for age discrimination.

For example, Plaintiff asserts Defendant gave inconsistent explanations for his termination, including that the formal termination notice stated "Jeff is being terminated for Policy violation that was substantiated through video on January 3, 2014" (Dkt. 32-26), while Ms. McCabe testified that Plaintiff was terminated for the cumulative effect of his prior disciplinary actions, the January 3 violation, and his lies about the January 3 violation.  McCabe Dep. at 173-74.  Similarly, Plaintiff points to perceived inconsistencies in Ms. Sapienza, Ms. Ricard, and Ms. McCabe's accounts of their investigation of the January 3 incident to infer discrimination.  [Dkt. 32-26 at 26.]  For example, Plaintiff notes that Ms. Sapienza testified she and her colleagues reviewed (i) Mr. Schwarz's January 8, 2014 statement memorializing the January 3, 2014 incident, (ii) Ms. Ocasio's statement summarizing the video surveillance footage from January 3, 2014 and her interview with Plaintiff about the incident on January 9, (iii) Mr. Schwarz's January 9, 2014 memorandum recounting his observation of Ms. Ocasio's January 9 interview with Plaintiff, (iv) Plaintiff's statement recounting the events of January 3, and (v) Defendant's building security policy before deciding to terminate Plaintiff.  Sapienza Dep. at 21.  Plaintiff contrasts this statement with Ms. Sapienza's statement that she reviewed Plaintiff's "previous corrective action" as well as "what the particular situation was and what those conversations looked like when we were doing our fact-finding for what happened that day."  [Dkt. 32-4 at 9.]  Plaintiff also notes that Ms. Ricard stated she "looked at his past performance, his past documentation" as well as "the video" and the documents Ms. Sapienza referenced.  [Dkt. 32-6 at 16.]  Plaintiff is

correct that these statements are not identical, but they are not contradictory. Each of these individuals stated Plaintiff was terminated for his breach of Defendant company's security protocol.  The fact that they do not parrot the same phrasing does not make their statements inconsistent.  Further, Plaintiff offers no evidence that these non-identical statements, or his termination, are tied to age discrimination.  As discussed in further detail below, references to "old school" methods of operation are not references to age.

Plaintiff also asserts he received disparate punishment for violating the building security policy, as he is unaware of a time when another employee was terminated for violating the same policy even though he has arrived at the store to find other managers sitting alone in the back office.  [Dkt. 28-1 at 61-62.] However, at no time has Plaintiff witnessed a person entering the store by him or herself without another employee under circumstances similar to his own, nor has he offered any evidence to that effect.  *Id.*  To establish age discrimination through evidence of disparate treatment, Plaintiff must show that "other similarly situated individuals were not disciplined or terminated when they engaged in similar conduct."  *Aillo v. Stamford Hosp.*, 2011 WL 3439459, at *15 (D. Conn. Aug. 8, 2011).  Plaintiff must offer evidence that he was "similarly situated in all material respects to individuals with whom he compares himself" to meet this "somewhat strict" burden.  *Id.*  "Conclusory statements that similarly situated employees outside the protected class were treated more favorably are not sufficient to defeat summary judgment."  *Id.*

Plaintiff's assertion that he is unaware of other employees being punished for entering Defendant's store alone even though he has seen employees in the store alone is "conclusory" and unsupported by evidence that he was "similarly situated in all material respects" with any individuals who allegedly broke Defendant's building security policy.  Further, Defendant has differentiated between Plaintiff and another employee who did enter the store alone and was not punished.  In that instance, a manager entered his store during a snow storm with the cleaners but without other store associates, but immediately called Ms. Sapienza to explain the situation.  Sapienza Dep. at 48.  Ms. Sapienza instructed the manager to exit the store and re-lock it if no associates arrived by the time the cleaning crew finished, which he did.  *Id*.  The manager was not reprimanded.  *Id*. at 47-48.  Plaintiff is not similarly situated with the manager who received no reprimand, because Plaintiff entered the store without the cleaning crew and did not call to notify any upper level management about the situation.  The only similarity between Plaintiff's situation and the other manager's is that both employees entered Defendant's stores during a snow storm.  The other manager entered the store with the cleaners, rather than totally alone, immediately notified his superior of the situation, was honest, followed instructions and vacated the store.  In addition, Plaintiff does not allege the other manager repeatedly violated company policy or required repeated corrective action like Plaintiff.  The Plaintiff is not similarly situated to this individual.

Plaintiff also asserts he never affirmatively stated a fellow employee entered the store with him on January 3, and asserts that Defendant's

interpretation of his statements as a lie evidences a discriminatory intent. [Dkt. 32-36 at 26.] This is disingenuous. Plaintiff was asked repeatedly whether he complied with the story entry policy by two different supervisors. He did not comply with the policy, he knew he did not comply, and at best he failed to admit it. He was dishonest. Nevertheless, Defendant has asserted a legitimate, non-discriminatory intent in terminating Plaintiff even absent evidence that he lied during the investigation.

Further, the statements that Plaintiff was a "dinosaur" and "old school," and any disparate treatment whereby he received greater criticism than his younger counterparts in maintaining his merchandise department, were all perpetrated by Mr. Schwarz. Mr. Schwarz did not recommend terminating Plaintiff and was not involved in the decision to terminate him. Sapienza Dep. at 20-21. In addition, the context of those statements reveals no age discrimination. Courts consider the context in which a statement is made to determine whether the remark provides "a basis on which a reasonable jury could determine that the adverse employment decisions at issue were motivated" by the alleged discrimination. *Men of Color Helping All Soc., Inc. v. Buffalo*, 529 F. App'x 20, 27 (2d Cir. 2013). The conversations Plaintiff asserts constitute age discrimination were discussions about a changing work environment, where Mr. Schwarz explained to Plaintiff a new way of completing tasks. [*E.g.* Dkt. 32-2 at 8 (recounting that Plaintiff told Mr. Schwarz he thought someone else was supposed to refill the computer paper, and Mr. Schwarz replied: "Well, that is old school. If we don't have it, you have to just go and get it" and that Mr. Schwarz

said Plaintiff was a "dinosaur" because his "hands-on" management style and tendency to "hop in and do the work" were different from other people's management styles).]  The Court finds these comments provide no reasonable basis for a jury to conclude Plaintiff's termination was age discrimination.

Nor does Plaintiff's allegation that other managers conducted succession planning to prepare for eventual retirements raise an inference of discrimination. As Ms. Ricard explained, management conducts succession planning annually to ensure the company has employees in all necessary positions in the event of a vacancy.  [Dkt. 32-6 at 5.]  This is a customary, prudent business practice.  The February 2013 succession planning was not aimed specifically at Plaintiff, and Plaintiff has provided no evidence that the "succession planning" included any effort to force Plaintiff to retire.  *Id.*

Plaintiff has offered no evidence that Defendant's legitimate, nondiscriminatory reason for firing him was a "mere pretext" for discrimination. Defendant's motion for summary judgment as to Plaintiff's ADEA age discrimination claim is GRANTED.

a.  Retaliation under ADEA

Plaintiff also alleges that Defendant retaliated against him.  To establish a *prima facie* claim for retaliation under the ADEA, the plaintiff must show that (1) he engaged in a protected activity; (2) his employer is aware of the activity; (3) the employer took some adverse action against him; and (4) a causal connection exists between the protected activity and the adverse action that a retaliatory motive played a part in the adverse employment action.  *Cifra v. G.E. Co.*, 252

F.3d 205, 216 (2d Cir. 2001).  Retaliation claims are also analyzed using the burden-shifting framework set forth in *McDonnell Douglas*.

The Court notes that the definition of protected activity does encompass "informal protests of discriminatory employment practices," such as "making complaints to management."  *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).  However "[t]o succeed on retaliation claim, the plaintiff must show that the employer could reasonably have understood that the plaintiff's opposition was directed at conduct prohibited by Title VII" or the ADEA.  *Chacko v. Connecticut*, No.3:07-cv-1120, 2010 WL 1330861, at *12 (D. Conn. March 30, 2010); *McDowell v. T-Mobile USA, Inc.*, 307 Fed. App'x 531, 534 (2d Cir. 2009) (plaintiff could not establish that he engaged in protected activity because he never explicitly complained about race discrimination, and there was no evidence, other than his own testimony, from which a jury could conclude that the supervisors could have understood the complaints were about race); *Ochei v. Coler / Goldwater Memorial Hosp.*, 450 F. Supp. 2d 275, 287 (S.D.N.Y. 2006) ("[plaintiff] has claimed that she was retaliated against for complaining about observations of her work, and other allegedly adverse actions. However, because she does not allege that she ever complained to her supervisors that she was the victim of discrimination, these complaints are not protected activity as a matter of law.").  Although complaints about conduct clearly prohibited by the ADEA "need not mention discrimination or use particular language, . . . ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity."

*Int'l Healthcare Exchange, Inc. v. Global Healthcare Exchange, LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (internal citation omitted).

Plaintiff testified that he "complained to the district manager [Ms. Sapienza] frequently that [he] wasn't being treated fairly," by Mr. Schwarz, but did not assert age discrimination "specifically" until after his termination.[5]   Frankel Dep. at 54. Plaintiff later clarified his deposition testimony to state while he did not refer to his treatment as age discrimination, he complained to Mr. Hannon and Ms. McCabe that he was "the most senior person," and had been "replaced in each one of my jobs by a younger manager . . . [and] that was the reason that this all came about."  [Dkt. 32-2 at 32.]  Plaintiff did not specify when he had these conversations, but the evidence indicates the only conversations Plaintiff had with Mr. Hannon or Ms. McCabe regarding his treatment occurred after he was terminated.  [Dkt. 32-2 at 29, 31; Dkt. 32-5 at 19-20.]  In fact, Plaintiff specifically refers to Ms. McCabe's notes from her post-termination conversation with Plaintiff in support of his retaliation argument.  [Dkt. 32 at 34.]

Plaintiff is correct that a complaint of age discrimination need not be formal to constitute a protected activity.  *Delgado v. Stamford*, 3:11-cv-01735, 2015 WL

---

[5] Plaintiff characterizes one conversation during his employment as establishing that he complained to others within Defendant's company about Mr. Schwarz's behavior; that is not this Court's interpretation of the testimony.  Plaintiff asserts he told operations manager Dave Herasco when Mr. Schwarz told Plaintiff it was "old school" to expect someone else to refill the printer, and Mr. Herasco's reply was "I will reorder it and get some."  [Dkt. 32-2 at 8.]  The Court must consider the context of the conversation.  *Men of Color Helping All Soc., Inc.*, 529 F. App'x at 27.  Plaintiff's conversation with Mr. Herasco, in context, was about who would get more computer paper; it would not provide a jury with a reasonable basis on which to find that Plaintiff complained of age discrimination in the work place and was terminated as a result.

6675534, at \*22 (D. Conn. Nov. 2, 2015) (citing *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).  However, "generalized complaints about a supervisor's treatment are insufficient" to "make clear that the employee is complaining about [discriminatory] conduct."  *Id.* at \*22.  The only complaint Plaintiff made prior to his termination, that he "wasn't being treated fairly," was too generalized to make the listener aware whether Plaintiff was complaining of age discrimination.  Plaintiff's conversations with Mr. Hannon and Ms. McCabe occurred after Plaintiff's termination and accordingly could not have been the basis for his termination.

Even if Plaintiff's conversations with Mr. Hannon and Ms. McCabe occurred before his termination, they would not have evidenced that his termination was in retaliation against an age discrimination complaint.  Rather, Plaintiff's statement that he was the most senior person at the store indicates that whenever he was transferred to a different merchandise department a younger employee would have had to take over his old department, just as he would have taken over a younger employee's responsibilities.  There is no evidence Defendant hired new, younger assistant managers during this time frame who were taking over Plaintiff's old tasks whenever he took over a new department.  Further, as discussed above, transferring to manage different departments within the store did not constitute an adverse employment action but rather was a mere change in responsibilities.  Plaintiff's statement that he was transferred to different merchandise departments does not evidence age discrimination; it is neutral. Moreover, Plaintiff's transfers are consistent with Defendant's efforts to correct

his performance deficiencies, specifically his need to gain a store-wide perspective rather than focusing only on the department to which he was assigned. *E.g.*, Performance Evaluations at 17 (2001 evaluation asserting Plaintiff "needs to grasp the 'team' concept and maintain a total store awareness"); *Id.* at 30 (2008 evaluation stating Plaintiff "needs to be more involved in the entire store operation not only limited to his own area").

Plaintiff has offered no evidence that he engaged in a protected activity – complaining of age discrimination. Plaintiff has accordingly failed to establish the first prong of the prima facie case for retaliation under ADEA. Defendant's motion for summary judgment as to Plaintiff's retaliation claim under ADEA is GRANTED.

### b.  Discrimination and Unlawful Retaliation under CFEPA

It is well established that CFEPA claims proceed under the same prima facie case and burden-shifting analysis as ADEA claims. *Craine v. Trinity Coll.*, 259 Conn. 625, 637 n.6 (2002) (holding that the Connecticut Supreme Court looks to federal precedent when interpreting and enforcing the CFEPA); *McInnis v. Town of Weston*, 375 F. Supp. 2d 70, 85 (D. Conn. 2005). However, the plaintiff's burden of proof at the final step of the burden-shifting analysis in Connecticut courts remains unclear. Connecticut courts have not yet stated whether they will adopt the Supreme Court's decision in *Gross*, 557 U.S. at 167, which requires a plaintiff to establish that his or her age was the "but for" cause of his or her termination, or continue applying the "motivating factor" test. *See Jacobs v. Gen. Elec. Co.*, 275 Conn. 395, 402 (2005) (applying the motivating factor test).

32

also impacts the CFEPA analysis.  Until such time as the Connecticut courts adopt the *Gross* standard in connection with age discrimination claims, this Court will follow existing Connecticut court pronouncements on the appropriate standard to employ in applying Connecticut law.  Here, Plaintiff has not presented sufficient evidence demonstrating age discrimination under both the less onerous CFEPA standard as well as the more onerous *Gross* standard.  Since the foregoing ADEA analysis applies to Plaintiff's CFEPA claims, Defendant's motion for summary judgment is also GRANTED as to Plaintiff's CFEPA claims.

IV.   <u>Conclusion</u>

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment as to all claims.  The Clerk is directed to close this case. SO ORDERED, this 10th day of July, 2017, Hartford, Connecticut

_____/s/_____

Vanessa L. Bryant,

United States District Judge